UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOSE GUILLERMO SANTIAGO, JR.,

    Plaintiff,

 v.               Case No. 20-cv-687-pp

DR. GILBERT, DR. PANOS,
DR. LEE, KRISTAN VASQUEZ,
and LAURA FRAZIER,

    Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING MOTION TO APPOINT COUNSEL (DKT. NO. 6) AND SCREENING THE COMPLAINT (DKT. NO. 1)**

---

  Plaintiff Jose Guillermo Santiago, Jr., an inmate at Racine Correctional Institution who is representing himself, filed a complaint alleging that the defendants violated his civil rights under 42 U.S.C. §1983 when he was given a medication which he believes caused him a severe allergic reaction. Dkt. No. 1. He also asked for leave to proceed without prepaying the filing fee. Dkt. No. 2. Since filing the complaint, the plaintiff has filed a motion to appoint counsel. Dkt. No. 6. This order resolves the outstanding motions and screens the complaint.

**I. Motion to Proceed without Prepayment of the Filing Fee (Dkt. No. 2)**

  The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915. That law allows a court to let an incarcerated plaintiff proceed with his case without

1

prepaying the filing fee if he meets certain conditions. One of those conditions is that the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On May 6, 2020, the court ordered the plaintiff to pay an initial partial filing fee of $69.13 by May 27, 2020. Dkt. No. 5. On May 26, 2020, the court received a payment of $75. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will allow him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.     Screening the Complaint**

A.     Federal Screening Standard

Under the Prison Litigation Reform Act (PLRA), the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d

2

714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.  Allegations in the Complaint

The plaintiff says that in October 2019 he was scheduled to have Dr. Gilbert extract his tooth. Dkt. No. 1 at 3. After the procedure, Gilbert asked the plaintiff if he was allergic to anything, and the plaintiff responded that he was

allergic to Augmentin. Id. The plaintiff asserts that Gilbert prescribed him Amoxicillin. Id. After taking that medication for several days, the plaintiff noticed that his feet, hands and face were swollen, and he was starting to break out in a rash and hives all over his body. Id. He wrote to the Health Services Unit ("HSU") to let them know what was going on and to ask if it had anything to do with his lupus. Id. The plaintiff says that he was called to the HSU the next day; a nurse saw him and asked him what he was doing that was different. Id. The plaintiff answered that nothing had changed. Id. The nurse asked the plaintiff whether he had changed the soap he used when showering or the washing powder he used to wash his clothes; he responded that there had been no changes. Id. When the nurse asked again what had changed, the plaintiff explained that he had his tooth extracted, and the dentist gave him Amoxicillin to prevent infection. Id.

The plaintiff alleges that the nurse then said, "oh shit he was not suppose[d] to give you that because you are allergic to amoxicillin and that medication falls under the scope of the umbrella." Id. at 2-3. The plaintiff asserts that the nurse said that if "he"—presumably Gilbert—had scanned the plaintiff's I.D., he would have seen what the plaintiff was allergic to, and she showed the plaintiff how a red flag showed up when his I.D. was scanned. Id. at 3. The plaintiff says the nurse left the room to consult with Dr. Mclean and Gilbert. Id. When she returned, the nurse allegedly informed the plaintiff that she was going to send him some medication to help with the allergic reaction and some lotion for the itch. Id. The plaintiff says that "[l]uckily another nurse

4

happened to be in the room;" this second nurse told the first nurse "that she could not send [the plaintiff] back and that she has to follow the emergency protocol." Id. The plaintiff says that "she"—perhaps the second nurse—left the room, came back and gave him some Benadryl and send him back to his unit. Id.

The plaintiff says that he was called to the HSU several times over several days "to be checked on and to see how [he] was doing." Id. He was called to the HSU on October 26, 2019 and was seen by another nurse. Id. This nurse asked the plaintiff if there was "anything else going on," and he responded that he was having trouble breathing and swallowing. Id. The nurse asked him to open his mouth and she looked inside. Id. The plaintiff told her that he was starting to panic because he was having trouble breathing; the nurse told him to sit down and not to panic as she called 911. Id. The nurse then called a corrections officer named Launderville who came to the HSU with another staff member. Id. The corrections staff grabbed the plaintiff under the arms and took him down the stairs and out to the ambulance. Id.

In the ambulance, the plaintiff received a shot and an oxygen mask was put on him. Id. At the hospital, a doctor saw the plaintiff and put him on a drip. Id. He received a shot that "burned like heck all over [his] body for a few seconds." Id. After several hours, he was sent back to the prison. Id.

The plaintiff alleges that when the allergic reaction did not abate, Mclean sent him out to see a doctor who was a specialist in allergies. Id. That doctor put the plaintiff on some different medications to try to help with the allergic

5

reaction. Id. The plaintiff alleges, however, that as of April 21, 2020 (the day before he signed his complaint), he still suffers from the allergic reaction and it is still inside him. Id. He says that whenever he sweats, his whole body gets red and swollen, breaks out in hives and starts to itch. Id. The plaintiff asserts that if Gilbert had followed proper procedure and scanned his I.D. before prescribing him medication, Gilbert would have seen what he was allergic to and would have known that Amoxicillin is "in the family tree" of Augmentin. Id.

The plaintiff seeks $25,000 in compensatory damages and $15,000 in punitive damages from each of the defendants. Id. at 5. He asks for future medical treatment and "to be free from physical and mental pain." Id. He requests that Gilbert be fired and have his license revoked. Id. He requests costs, not to be transferred to any other institution without his consent and a permanent injunction prohibiting the defendants from threatening or retaliating against him for filing this suit. Id. at 5-6.

C. Analysis

In the caption of his complaint and in the section on pages one and two where he was asked to name the defendants, the plaintiff named five people: Dr. Gilbert, Dr. Panos, Dr. Lee, Kristan Vasquez and Laura Frazer. The only one of these five people whom he named in the body of the complaint, however, was Gilbert. The complaint does not allege that Panos, Lee, Vasquez or Frazier had anything to do with the events that led to the allergic reaction. The court will dismiss them as defendants.

The plaintiff alleges even though he informed Gilbert that he was allergic to Augmentin, Gilbert prescribed him Amoxicillin and did so without following the prison procedure that required him to scan the plaintiff's I.D. to find out if he had recorded allergies. It seems to the court that the plaintiff is claiming that Gilbert was deliberately indifferent to his serious medical need. A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment where he is deliberately indifferent "to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" Roe v. Elyea, 631 F.3d 843 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). The condition does not need to be life-threatening to be serious; it needs only to be "a condition that would result in further significant injury or unnecessary and wanton infliction of pain" if not addressed. Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010).

A plaintiff must allege "that an official *actually* knew of and disregarded a substantial risk of harm." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). The plaintiff also "must show more than mere evidence of malpractice." Id. The plaintiff must show that the prison official's choices

7

"were so 'significant a departure from accepted professional standards or practices' that it is questionable whether they actually exercised professional judgment." Stallings v. Liping Zhang, 607 F. Appx. 591, 593 (7th Cir. 2015) (quoting Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)).

The court will allow the plaintiff to proceed on a deliberate indifference claim against Gilbert. The allergic reaction was serious enough to cause a painful rash, to affect the plaintiff's ability to breathe and swallow and to warrant a 911 call and a trip to the hospital, and the plaintiff says that the reaction lingered for months. That is sufficient at this stage to meet the first, objective prong of the deliberate indifference test and to show that the plaintiff suffered from an objectively serious medical condition. As to the second, subjective prong, the plaintiff alleges that he told Gilbert that he was allergic to Augmentin, that Augmentin is in the same family of drugs as Amoxicillin and that Gilbert prescribed Amoxicillin anyway. He also alleges that there was a procedure that required Gilbert to scan his I.D. before prescribing him any medication and that if Gilbert had followed that procedure, he would have seen the plaintiff's allergy and known he could not be prescribed Amoxicillin. While arguably a doctor's failure to recognize that anyone allergic to Augmentin would also be allergic to Amoxicillin (if that is true) could be construed as mere malpractice (which does not make one liable under the Constitution), the court must construe an unrepresented plaintiff's claims liberally at the screening stage. The court will allow the plaintiff to proceed on a claim that Gilbert was deliberately indifferent to his serious medical need.

8

The first sentence of the plaintiff's "Statement of Claim" section says, "Doctor Gilbert and everyone who works at the Health Service Unit." Dkt. No. 1 at 3. If the plaintiff intended to sue everyone who worked at the Racine Correctional Health Services Unit, he cannot do so. Section 1983 allows a plaintiff to sue any "person" who violated his civil rights while acting under color of state law. For a prison employee to be subject to liability under §1983, the plaintiff must show that that employee had "personal responsibility" for the deprivation of his constitutional rights. Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000) (citation omitted). The plaintiff cannot sue anyone and everyone who worked at the Health Services Unit, only those individuals who were involved in the actions that he claims deprived him of his rights.

The court already has dismissed Vasquez and Frazier because the plaintiff did not say who they were (other than "Health Services") and what they did to violate his rights. The plaintiff mentioned three nurses who saw him during the events he describes. In case Vasquez and Frazier were two of those three nurses, the court also notes that he has not stated a deliberate indifference against any of the three nurses. All three of them tried to help the plaintiff. The first nurse figured out that the plaintiff should not have been given Amoxicillin, went to talk to Gilbert and McLean about it and came back intending to give him some medication to help him. The second nurse intervened to make sure that emergency protocol was being followed and got the plaintiff some Benadryl. The third nurse called 911 and had the plaintiff taken to the hospital when he was having trouble breathing and swallowing.

9

None of these nurses were deliberately indifferent to the plaintiff's allergic reaction.

### III. Motion to Appoint Counsel (Dkt. No. 6)

The plaintiff has asked the court to appoint him a lawyer. Dkt. No. 6. In a civil case the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Pennewell v. Parish, 923 F.3d 486, 490 (7th Cir. 2019), (quoting Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). In his motion, the plaintiff provides several letters from lawyers declining to represent him, thus meeting the first prong. Dkt. No. 6-1.

When considering the second prong the court "must examine the

difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490-491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett 930 F.3d at 871.

The plaintiff has not demonstrated that he cannot handle the case himself at this stage of the proceedings. The plaintiff's complaint was clear and easy to understand. The court knows exactly what he is alleging. He has followed the court's instructions—he provided his inmate trust account as required and paid the initial partial filing fee. He has filed a motion and a letter; the court was able to understand both.

It is true that the plaintiff's allegations relate to a medical issue. Medical issues can be complex. It appears, however, that the medical issue in the plaintiff's case is less complex. The issue is whether Dr. Gilbert's failure to scan the plaintiff's I.D., and his decision to give the plaintiff Amoxicillin when the

11

plaintiff told Gilbert that he was allergic to Augmentin, was deliberately indifferent. The only "complex" issue may be the question of whether a doctor should know that someone who is allergic to Augmentin would also be allergic to Amoxicillin.

The next step in the case is for Gilbert to answer or otherwise respond to the complaint. After that, the court will issue a scheduling order, setting dates for the parties to exchange "discovery." "Discovery" is a process that allows the parties to collect information about the issues in the case by serving on each other written questions (interrogatories) and requests for documents. A person does not need to be trained in the law, or to do legal research, to ask or truthfully answer questions or to ask for documents. The plaintiff's filings so far demonstrate that when the time comes, he is capable of asking the defendant for information through written questions and requests for documents.

After the discovery phase comes the dispositive motion phase. Dispositive motions typically are motions for summary judgment. In a summary judgment motion a party will ask the court to dismiss the case because it believes there are no genuine disputes of material fact and the party is entitled to judgment as a matter of law. If the defendant files a motion for summary judgment, the plaintiff does not need to be trained in the law to respond to the motion, nor does he need to contact experts. Whether a court grants or denies summary judgment depends on whether there are one or more genuine disputes of material fact. The plaintiff clearly knows the facts of his case. The court is

12

familiar with the law and, if there is a summary judgment motion, will not need the plaintiff to explain the legal basis of his claims. Instead, it will need the plaintiff to explain which of the defendant's facts the plaintiff disputes and why. The plaintiff's filings to date indicate that he can participate in discovery and respond to a summary judgment motion to tell his side of the story.

The court denies without prejudice the plaintiff's motion to appoint counsel. If the plaintiff's circumstances change or he encounters obstacles that he does not believe he can handle on his own, he may renew his motion.

### IV. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to appoint counsel. Dkt. No. 6.

The court **DISMISSES** defendants Dr. Panos, Dr. Lee. Kristan Vasquez and Laura Frazier.

Under an informal service agreement between the Wisconsin Department of Justice and this court, a copy of the complaint and this order have been electronically transmitted to the Wisconsin Department of Justice for service on defendant Dr. Gilbert. Under the informal service agreement, the court **ORDERS** Dr. Gilbert to file a responsive pleading to the complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff shall collect from his institution trust account the **$275** balance of the filing fee by

13

collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency shall clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution shall forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the officer in charge of the agency where the plaintiff is confined.

The court will issue a separate order **REFERRING** this case to Magistrate Judge William E. Duffin for pretrial proceedings.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and filing dispositive motions.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

---

[1] The Prisoner E-Filing Program is mandatory for all inmates of Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

14

Office of the Clerk
United States District Court
Eastern District of Wisconsin
362 United States Courthouse
517 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court also advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

The court will include a guide prepared by court staff to address common questions that arise in cases filed by prisoners. Entitled "Answers to Prisoner Litigants' Common Questions," this guide contains information that the plaintiff may find useful in prosecuting his case.

Dated in Milwaukee, Wisconsin this 12th day of November, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**